ELECTRIC POWER BOARD OF the METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, Plaintiff/Appellant,

v.

MIDDLE TENNESSEE ELECTRIC MEMBERSHIP CORPORATION, City of Mt. Juliet, and its Mayor Ed Binkley and its Commissioners, Wayne Crawford, Frank Henderson, James L. Page, Fred Weston, Defendants/Appellees.

Court of Appeals of Tennessee, Middle Section, at Nashville.

May 15, 1992.

Permission to Appeal Denied by Supreme Court Aug. 24, 1992.

Petition to Rehear Denied Oct. 26, 1992.

Cecil D. Branstetter, Donald L. Scholes, Eugene W. Ward, Gen. Counsel, Nashville Elec. Service, Nashville, for plaintiff/appellant.

James C. Cope, Darrell L. Scarlett, Murfreesboro, for defendant/appellee Middle Tennessee Elec. Membership Corp.

James L. Fuqua, Jr., Hendersonville, for defendants/appellees City of Mt. Juliet, Mayor Ed Binkley, Commissioners Wayne Crawford, Frank Henderson, James L. Page and Fred Weston.

## OPINION

CANTRELL, Judge.

The primary issue in this case is whether a municipality may, by ordinance, grant an electric utility a franchise covering the territory within the municipality served by another electric utility. The chancellor granted summary judgment to the city. We conclude that, on the issues raised in this case, the chancellor was in error.

### I.

The Electric Power Board of the Metropolitan Government of Nashville and Davidson County (NES) operates an electric power distribution system in Davidson County and portions of surrounding counties. The Middle Tennessee Electric Membership Cooperative (MTEMC) is an electric cooperative serving parts of several counties in Middle Tennessee. Prior to 1968, the two utilities had for some years served different portions of west Wilson County in the area now incorporated in the City of Mt. Juliet.

In 1968, the Legislature passed an act, codified at Tenn.Code Ann. § 6–51–112, dealing generally with the rights of electric

cooperatives operating in an area taken in by annexation. The act provides that, if an annexing municipality operates its own electric system, it shall either offer to purchase the system and the service rights of the electric cooperative or shall grant the cooperative a franchise to serve the annexed area. If the municipality elects to purchase the cooperative's system, the statute sets out an elaborate scheme by which the municipality must reimburse the electric cooperative. Tenn.Code Ann. § 6–51–112(a)(1–5). Subparagraphs (6) and (7) of the act, however, deal with the territories of municipal power systems and electric cooperatives operating outside municipal boundaries. These sections provide:

(6) Provided, further, nothing contained herein shall prohibit municipalities and any cooperative from buying, selling, or exchanging electric distribution properties, service rights and other rights, property, and assets by mutual agreement;

(7) Provided, further, the territorial areas lying outside municipal boundaries served by municipal and cooperative electric systems will remain the same as generally established by power facilities already in place or legal agreements on March 6, 1968, and new consumers locating in any unserved areas between the respective power systems shall be served by the power system whose facilities were nearest on March 6, 1968, except to the extent that territorial areas are revised in accordance with the provisions of this section;

Pursuant to subparagraph (a)(6), NES and MTEMC, from time to time, entered into agreements adjusting the areas served by each utility.

The City of Mt. Juliet was incorporated in 1972. Despite having the power to grant franchises for the furnishing of public utilities, Tenn.Code Ann. § 6–19–101(12), the city took no action with respect to the distribution of electric power within its borders. NES and MTEMC continued to serve the areas of the city they had previously served, except for another voluntary adjustment made by agreement in 1987 pursuant to Tenn.Code Ann. § 6–51–112(a)(6).

In 1989 the legislature passed an act, now codified as Chapter 34 of Title 65 of the Tennessee Code, titled "Geographic Territories of Electric Utility Systems". The chapter starts out by making certain findings and stating the legislative intent:

(1) Duplication of electric system facilities leads to excessive consumer costs and adverse environmental and aesthetic impacts;

(2) The public health, safety, and welfare require that electric service to a particular geographic area be provided by a single electric system;

(3) The general assembly has heretofore established the geographic territories of electric systems as those geographic areas in which a particular electric system maintained facilities to provide electric service on March 6, 1968, except as those geographic areas have been modified by statutorily authorized agreements among adjacent electric systems, all as provided by § 6–51–112;

(4) Maintenance of the previously established geographic territories, as modified by statutorily authorized agreements, continues to be in the public interest and promotes the public health, safety and welfare;

Tenn.Code Ann. § 65–34–101(1–4).

The act goes on to provide in Tenn.Code Ann. § 65–34–107:

(a) Nothing in this chapter shall impair the right and power of municipalities to operate or authorize the operation of municipal electric systems or electric and community service cooperatives within their municipal boundaries consistent with the provisions of § 6–51–112.

(b) The provisions of § 6–51–111 to the contrary notwithstanding, municipalities may not through the grant of franchises or other operating authority expand the current geographic territories of non-consumer owned electric systems.

Although the balance of the chapter primarily limits the power of non-consumer owned systems to expand beyond their current boundaries, the effect of the chapter

on the current boundaries of municipally owned electric systems and electric cooperatives cannot be ignored.

On December 4, 1989, the City Council of Mt. Juliet enacted an ordinance granting MTEMC a non-exclusive franchise to provide electric power service within the city. Although it is not apparent from the text of the franchise, the comments of interested parties at the commission meeting make it clear that the commission's intent was to oust NES from serving any area within the city.

NES filed an action in the Chancery Court of Wilson County against the city, the mayor, the members of the city commission, and MTEMC. The complaint asked for: (1) a declaration that NES could continue to serve their customers within its service area as previously established by agreement with MTEMC; (2) specific performance of its prior agreements with MTEMC and damages for breach of the agreements; (3) a declaration that the city ordinance impaired a contract between NES and its bond holders; (4) damages from the city for maliciously interfering with the contract between NES and MTEMC; and (5) a declaration that the city is estopped to deny NES the right to provide electric service to its customers within the city.

The defendants answered the complaint and both sides moved for summary judgment. The chancellor granted summary judgment to the defendants on all counts and dismissed the complaint.

## II.

Out of the labyrinth created by the legislature with respect to cities and towns, electric cooperatives, and municipal electric systems, we think the following principles are now applicable:

### A.

Prior decisions of our Supreme Court have held that a municipality has the exclusive power to control the distribution of electricity within its boundaries. *Duck River Electric Membership Cooperative v. City of Manchester,* 529 S.W.2d 202 (Tenn.

1975) and *Franklin Power and Light Co. v. Middle Tennessee Electric Membership Corp.,* 222 Tenn. 182, 434 S.W.2d 829 (Tenn.1968). However, that power has been curtailed by the passage of Tenn.Code Ann. § 65–34–101, et seq. A municipality may no longer grant a franchise that expands the operating territory of a non-consumer owned electric system, Tenn. Code Ann. § 65–34–107(b), and the exercise of the remaining power is circumscribed by the provisions of Tenn.Code Ann. § 6–51–112. *See* Tenn.Code Ann. § 65–34–107(a).

### B.

Tenn.Code Ann. § 6–51–112(a) provides that a municipality *annexing* an area served by an *electric cooperative* must grant the cooperative a franchise for the area annexed or acquire the electric distribution properties from the cooperative at a price set by the statute. Technically this statute does not apply to the "situation at hand" as Justice Burnett said in *Franklin Power and Light,* 434 S.W.2d at 831. It applies only to existing municipalities expanding their boundaries by annexation into areas served by electric cooperatives. Here, the City of Mt. Juliet did not expand, it incorporated, and NES is not an electric cooperative. The Supreme Court, however, adopted the statutory pay-out scheme in subsection (a)(2) and applied it to a case where the municipality sought to condemn an electric system which had previously been operated under the municipality's franchise. *Duck River Electric Membership Cooperative v. City of Manchester,* 529 S.W.2d 202 (Tenn.1975).

### C.

In passing Tenn.Code Ann. § 6–51–112(a)(6)(7), the legislature intended to fix the territories of municipal electric systems and cooperatives operating outside municipal boundaries as the various territories existed on March 6, 1968—subject to the ability of the affected parties to alter the territories by agreement. Although the defendants correctly point out that these subsections are part of a statute that starts out by defining rights where a municipality

annexes a territory served by an electric cooperative, subsections (a)(6)(7) are written in language having general application. In addition, in passing Tenn.Code Ann. § 65–34–101 et seq., the legislature left no doubt about its intent.

As this recitation shows, the statutes and the decisions leave a large void involving the facts of this case. None of the authorities deal with a situation in which a municipality incorporates an area served by an electric system operated by an adjacent municipality. However, we do not think the statutes give a municipality which incorporates such an area the right to deal in an arbitrary fashion with a supplier of electrical services in the area. If, as the defendants insist, NES has no rights in this situation, and is merely a trespasser on the city's property, then it follows that NES has no obligations either. Would the city concede that NES could abruptly cease operations and turn the power off to a large segment of the city's population? Justice Henry recognized this impasse in *Duck River* and said only the "orderly processes of the law" could prevent the city being thrown into darkness. 529 S.W.2d at 204.

■ The city and MTEMC argue that NES is violating the Metro charter and various statutes by operating in Wilson County and Mt. Juliet without permission. *See* Tenn.Code Ann. §§ 7–34–105, 7–52–103(1), and 7–52–104. We think, however, the city begs the question. NES was operating in Wilson County before Mt. Juliet existed and Wilson County, a non-party to this action, has not complained. For seventeen years Mt. Juliet gave at least implied consent to NES's operations inside the city. To argue otherwise is disingenuous. We hold that Mt. Juliet may now withdraw that consent and is not estopped from doing so—but the withdrawal must be accompanied by the "orderly processes of the law." *Duck River*, 529 S.W.2d at 204.

We conclude that the orderly process is provided by Tenn.Code Ann. § 6–51–112. Mt. Juliet itself may take over the distribution of electric power within the city, but it may not take the distribution system of one supplier of electric power and give it to another.

The judgment of the court below is reversed and a declaratory judgment is entered here for NES on the first count of its complaint. The cause is remanded to the Chancery Court of Wilson County for the consideration of the other issues raised by the pleadings. This court takes no position on the merits of the remaining claims. Tax the costs on appeal to the appellees.

TODD, P.J., and LEWIS, J., concur.