# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE

**FILED**

**August 31, 1998**

**Cecil W. Crowson**
**Appellate Court Clerk**

| | | |
|---|---|---|
| CITY OF SOUTH FULTON, TENNESSEE | ) | FOR PUBLICATION |
| CITY OF BRADFORD, TENNESSEE; and | ) | |
| WEAKLEY COUNTY, TENNESSEE, for | ) | **Filed: August 31, 1998** |
| the use and benefit of Weakley County | ) | |
| Municipal Electric System, | ) | |
| | ) | |
| Plaintiff - Respondent, | ) | Certified Question of Law |
| | ) | from the United States |
| | ) | Court of Appeals for the |
| v. | ) | Sixth Circuit. (No. 96-6201) |
| | ) | |
| HICKMAN-FULTON COUNTIES RURAL | ) | |
| ELECTRIC COOPERATIVE CORPORATION; | ) | |
| WALLY BEYER, Administrator, Rural | ) | No. 01-S-01-9710-FD-00215 |
| Electrification Administration, U.S. Department | ) | |
| of Agriculture; CHARLES B. GILL, Governor, | ) | |
| National Rural Utilities Cooperative Finance | ) | |
| Corporation; NATIONAL BANK FOR | ) | |
| COOPERATIVES, | ) | |
| | ) | |
| Defendants, (Trial Only) | ) | |
| | ) | |
| GIBSON ELECTRIC MEMBERSHIP | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant - Petitioner. | ) | |

For Plaintiff-Respondent:

Frank S. King, Jr.,
King & Ballow
Nashville, Tennessee

For Defendant/Petitioner:

Herbert S. Sanger, Jr.
Charles A. Wagner III
Wagner, Myers & Sanger, P.C.
Knoxville, Tennessee

G. Griffin Boyte
Warmath and Boyte
Humboldt, Tennessee

# OPINION

DROWOTA, J.

## QUESTIONS CERTIFIED

Pursuant to Rule 23 of the Rules of the Supreme Court of Tennessee,[1] this Court accepted certification of the following two questions from the United States Court of Appeals for the Sixth Circuit.

> 1. Does Tennessee law, specifically the Municipal Electric Plant Law, Tenn. Code Ann. §§ 7-52-101 -- 7-52-310, the Local Government Public Obligations Act, Tenn. Code Ann. §§ 9-21-101 -- 9-21-1016, or the Revenue Bond Law, Tenn. Code Ann. §§ 7-34-101 -- 7-34-118, authorize a city to condemn the facilities and service areas of an electric cooperative serving consumers within the city's municipal boundaries and to grant to another county's electric system the right to operate those facilities and provide service to consumers within those service areas?
>
> 2. If Tennessee law does so authorize, does Tennessee Code Annotated Section 6-51-112 nevertheless prohibit the city from altering any service areas that were outside the city's municipal boundaries on March 6, 1968?

As more fully explained below, our conclusion with respect to the first question is that Tennessee law, specifically the Revenue Bond Law, authorizes a city to condemn the facilities and service areas of an electric cooperative serving consumers within the city's municipal boundaries and to grant to another county's electric system the right to operate those facilities and provide service to consumers within those service areas. With respect to the second certified question, we conclude that Tenn.

---

[1] "The Supreme Court may, at its discretion, answer questions of law certified to it by the Supreme Court of the United States, a Court of Appeals of the United States, a District Court of the United States in Tennessee, or a United States Bankruptcy Court in Tennessee. This rule may be invoked when the certifying court determines that, in a proceeding before it, there are questions of law of this state which will be determinative of the cause and as to which it appears to the certifying court there is no controlling precedent in the decisions of the Supreme Court of Tennessee." Tenn. R. Sup. Ct. 23, § 1.

Code Ann. § 6-51-112 does not prohibit the city from altering service areas that were outside the city's municipal boundaries on March 6, 1968.

## BACKGROUND

The following summary of facts relevant to the legal questions in this appeal was derived from the certification order of the Sixth Circuit. Until 1994 electric service in the City of Bradford, Tennessee was provided by both Gibson Electric Membership Corporation (Gibson) and Weakley County Municipal Electric System (WCMES). In the City of South Fulton, Tennessee, electric service was provided by three distributors: Gibson, WCMES, and Hickman-Fulton Counties Rural Electric Cooperative Corporation (Hickman). In April 1994, the mayor of South Fulton notified the three distributors that the electric plant franchise for the city had expired. He explained that the Board of Commissioners would consider any pertinent information submitted by the distributors regarding rates and terms and that the distributors would have an opportunity to address the Board at a meeting in May. All three distributors appeared at this meeting. The Board then determined that WCMES could provide the best service at the most reasonable rates and granted it a twenty-five year exclusive franchise within the corporate limits of South Fulton. Bradford granted a twenty-year exclusive franchise to WCMES within its corporate limits.

South Fulton and Bradford offered to purchase from Gibson and Hickman the service rights for their consumers located within the city boundaries. The cooperatives refused to sell. South Fulton, Bradford, and Weakley County, for the benefit of WCMES, then filed petitions for condemnation in state court. The cases were removed to federal court pursuant to 28 U.S.C. § 1441.

– 3 –

Thereafter, the federal district court consolidated the cases into a single proceeding. Hickman and Gibson filed motions to dismiss asserting, in pertinent part, that the respondents do not have authority under Tennessee law to condemn their property. The federal district court denied the petitioners' motions to dismiss. Eventually, the parties entered an agreed final judgment setting the amount of just compensation due to Hickman and Gibson for their respective property and service rights within the municipal boundaries of South Fulton and Bradford and preserving Gibson's right to appeal the question of the respondents' right to take.[2]

Gibson then appealed to the Sixth Circuit Court of Appeals, challenging the respondents' right to condemn Gibson's property and service rights in the two municipalities. Concluding that the appeal involved determinative questions of Tennessee law, the Sixth Circuit entered an order certifying to this Court the two questions set forth above. We accepted certification of the questions posed and address each hereafter.

## I. FIRST QUESTION - EMINENT DOMAIN AUTHORITY

We begin with the question "[d]oes Tennessee law, specifically the Municipal Electric Plant Law, Tenn. Code Ann. §§ 7-52-101 -- 7-52-310, the Local Government Public Obligations Act, Tenn. Code Ann. §§ 9-21-101 -- 9-21-1016, or the Revenue Bond Law, Tenn. Code Ann. §§ 7-34-101 – 7-34-118, authorize a city to condemn the facilities and service areas of an electric cooperative serving consumers within the city's municipal boundaries and to grant to another county's electric system the

---

[2]Following entry of the final judgment, Hickman accepted from the respondents' the amount specified as just compensation. Thus, the only interested parties to this appeal are the respondents and Gibson.

–4–

right to operate those facilities and provide service to consumers within those service areas?"

We begin our analysis of this question with the Revenue Bond Law, Tenn. Code Ann. §§ 7-34-101 to -118.  A portion of that statute provides that a municipality[3] has the power to:

> Construct, <u>acquire by</u> gift, purchase, <u>or the exercise of the right of eminent domain</u>, reconstruct, improve, better or extend <u>any public works</u>, <u>within or without the municipality</u>, or partially within or partially without the municipality, and acquire by gift, purchase or the exercise of the right of eminent domain, lands or rights in land or water rights in connection therewith[.]

Tenn. Code Ann. § 7-34-104(1) (1992 Repl.) (emphasis added).  The term "public works" is defined by the statute to include "electric heat, light or power works, plants and systems . . . together with all parts thereof and appurtenances thereto including, but not limited to, supply and distributions systems...."  Tenn. Code Ann. § 7-34-102 (1992 Repl. & Supp. 1997).

In <u>Duck River Elec. Membership Corp. v. City of Manchester</u>, 529 S.W.2d 202 (Tenn. 1975), this Court held that Section 104(1)[4] authorized a municipal corporation to condemn the electric system of a not-for-profit electric membership corporation located within the city boundaries.  Duck River Electric Membership Corporation had supplied electricity to the City of Manchester under a fifteen-year franchise that expired on January 8, 1973.  The franchise was not renewed, but Duck River

---

[3]The statute defines the term municipality to include "any county, incorporated city or town of the state."  Tenn. Code Ann. § 7-34-102(2) (1997 Supp.).

[4]This statute was then codified at Tenn. Code Ann. § 6-1304.

continued to supply electricity to the City. However, in June of 1974, the City of Manchester adopted an ordinance declaring that it would establish a municipally-owned electric distribution system. Thereafter, the City of Manchester brought suit seeking to acquire by eminent domain that portion of Duck River's electric distribution system located within the corporate limits of the city.

On appeal to this Court, Duck River challenged the City's authority to acquire the property by eminent domain. This Court rejected the challenge and held that the City was authorized under the Revenue Bond Law to condemn Duck River's property. In so holding, we stated:

> In the clearest of language this statute empowers the city to acquire by condemnation, any public works, and land or rights in land, in connection therewith. <u>This is a clear and complete remedy. It is not necessary to rely upon any other statute</u>.

<u>Duck River</u>, 529 S.W.2d at 205 (emphasis added).

In our view, the holding in <u>Duck River</u> dictates our response to the question presented in this case. As in that case, the Revenue Bond Law here also provides a "clear and complete remedy." Under the statute as interpreted in <u>Duck River</u>, Bradford and South Fulton have the authority to condemn Gibson's facilities and service areas within their respective municipal boundaries. We need not refer to any other statute.

Gibson asserts that this case is distinguishable from <u>Duck River</u> because, unlike the City of Manchester, Bradford and South Fulton are not establishing municipally-owned electric distribution systems. Gibson asserts that this difference is important

–6–

because the Revenue Bond Law only authorizes condemnation if a city is planning to use the property to establish, operate, and manage its own municipal electric distribution system. In support of its argument, Gibson cites Tenn. Code Ann. § 7-34-103 (1992 Repl.), which provides as follows:

> **Declaration of policy** - (a) It is declared to be the policy of this state that any municipality acquiring, purchasing, constructing, reconstructing, improving, bettering or extending any public works . . . shall manage such public works in the most efficient manner consistent with sound economy and public advantage to the end that the services of the public works shall be furnished to consumers at the lowest possible cost.
>
> (b) No municipality shall operate such public works for gain or profit or primarily as a source of revenue to the municipality, but shall operate such public works for the use and benefit of the consumers served by such public works and for the promotion of the welfare and for the improvement of the health and safety of the inhabitants of the municipality.

(Emphasis added.). Contrary to Gibson's argument, this statute does not contain a provision which requires a municipality to itself operate public works property acquired by eminent domain. Instead, it simply declares that as a matter of state policy, municipalities must "manage" the public works in the manner most efficient and economical to the consumer. To that end, the statute prohibits municipalities from operating public works for gain, profit, or primarily as a source of revenue. Nothing in this statute prohibits Bradford and South Fulton from determining that the most economically efficient way to manage the distribution of electricity within their corporate limits is through the grant of an exclusive franchise to WCMES.

Moreover, Gibson's argument is undercut by this Court's decision in Duck River. Although the City of Manchester had voted to establish a municipally-owned electric service, in ruling on a petition to rehear, this Court discussed the options upon remand, stating the City of Manchester, "may proceed with the suit or it may dismiss,

at its option. It may construct its own system or it may franchise a competing system, or it may exercise numerous other options and alternatives." Duck River, 529 S.W.2d at 209. Our decision in Duck River clearly did not turn upon whether or not the City of Manchester established a municipal electric system. Instead, we explicitly recognized in Duck River the city's right to grant a franchise to a competing system, and we stated that "a municipality has the exclusive power to control distribution of electricity within its boundaries." Id. at 206-07; see also Franklin Power & Light v. Middle Tenn. Membership Corp., 222 Tenn. 182, 434 S.W.2d 829 (1968). In this case, South Fulton and Bradford have chosen to grant an exclusive franchise to WCMES rather than establish their own municipal electric systems. Municipalities in Tennessee have the right to grant exclusive franchises for public utilities and public services, regardless of the form of the municipal government. See Tenn. Code Ann. § 6-2-201(12) (1992 Repl. & 1997 Supp.) (mayor-aldermanic charters); Tenn. Code Ann. § 6-19-101(12) (1992 Repl. & 1997 Supp.) (city-manager-commission charters); Tenn. Code Ann. § 6-33-111(1992 Repl. & 1997 Supp.)(modified manager-council charters). Our decision in Duck River did not in any way eliminate this right.

Therefore, we conclude that under Tenn. Code Ann. § 7-34-104, Bradford and South Fulton may condemn real, personal, or mixed property of Gibson located within their respective municipal boundaries, and in accordance with Tennessee law, grant a franchise to WCMES. Accordingly, this Court affirmatively answers the first question certified by the Sixth Circuit.

## II. SECOND QUESTION: IMPACT OF TENN. CODE ANN. § 6-51-112

Having decided that Tennessee authorizes the condemnation, we must next determine whether "Tennessee Code Annotated Section 6-51-112 nevertheless prohibits the city from altering any service areas that were outside the city's municipal boundaries on March 6, 1968? "

We begin our analysis of this issue with a brief overview of the statutory section. Title 6, Chapter 51 of the Tennessee Code contains the statutory provisions that govern municipal annexation. The specific statute at issue in this case, Tenn. Code Ann. § 6-51-112 (1992 Repl.), delineates the options that are available when a municipality which owns and operates its own electric system annexes an area to which electric service is being provided by an electric cooperative. Generally, this statute provides that the annexing municipality must either purchase the property and service rights of the electric cooperative, or, in the alternative, grant the electric cooperative a franchise to serve the annexed area. Specifically, the statute provides, in pertinent part, as follows:

> (a) Notwithstanding the provisions of any other statute, <u>if the annexing municipality owns and operates its own electric system</u>, it shall either offer to purchase any electric distribution properties and service rights within the annexed area owned by any electric cooperative, or grant such cooperative a franchise to serve the annexed area, as hereinafter provided. . . .

(Emphasis added). If an annexing municipality which owns and operates its own electric system chooses to purchase the property and service rights of the electric cooperative, the statute sets forth the formula which must be utilized to determine the fair purchase price. Tenn. Code Ann. § 6-51-112(a)(2) (1992 Repl). In the event the annexing municipality chooses to grant a franchise to allow the electric cooperative to continue to serve the area, the statute sets forth the procedure which applies and provides that upon expiration of the franchise, the municipality may again exercise

its option to purchase the property and service rights of the electric cooperative. Tenn. Code Ann. § 6-51-112(a)(4) (1992 Repl.). In the event a municipality contracts its boundaries to exclude an area previously served by an electric cooperative, the statute allows the electric cooperative the option of purchasing the property and service rights to the area it had previously served from the municipally-owned electric system. Tenn. Code Ann. §6-51-112(a)(5) (1992 Repl.).

This brief summary reveals that Section 112 is designed to govern the relationship between electric cooperatives and annexing municipalities which own and operate electric systems. Neither Bradford nor South Fulton qualify as an annexing municipality which owns and operates its own electric system. Accordingly, Section 112 simply is not applicable in this appeal.

Contrary to Gibson's contention, Section 112 does not prevent all municipalities, other than those annexing municipalities which own and operate electric systems, from acquiring the property and service rights of an electric cooperative. Section 112 contains no such limitation. It simply does not apply to an annexing municipality which does not own and operate its own electric system.

Gibson also argues that it has a statutory right to continue to provide electricity to customers that it served on March 6, 1968, even if those customers are now within the boundaries of Bradford and South Fulton. In support of this argument Gibson relies upon Section 112(a)(7) which provides:

> The territorial areas lying outside municipal boundaries served by municipal and cooperative electric systems will remain the same as generally established by power facilities already in place or legal

> agreements on March 6, 1968, and new consumers locating in any unserved areas between the respective power systems shall be served by the power system whose facilities were nearest on March 6, 1968, except to the extent that territorial areas are revised in accordance with the provisions of this section.

Tenn. Code Ann. § 6-51-112(a)(7) (1992 Repl.).

In our view, Gibson fails to recognize that, like the other portions of Section 112, subsection (a)(7) simply is not applicable in this case. As between annexing municipalities which own and operate electric systems and electric cooperatives, this provision appears to establish general priorities to new service areas lying outside municipal boundaries. This dispute did not arise in the context of an annexation proceeding. Bradford and South Fulton are not annexing municipalities which own and operate electric systems. This appeal does not involve new service areas which lie outside municipal boundaries. This statutory provision simply has no relevance or application in this appeal. Instead it is designed to govern the relationship between electric cooperatives and annexing municipalities which own and operate electric systems.

We also reject Gibson's alternative argument that Tenn. Code Ann. § 65-34-103 (1993 Repl.), circumscribes the respondents' right to alter its service area. That statute provides, in pertinent part, that

> No non-consumer owned electric system may construct, acquire, or maintain facilities, lines, poles, or other equipment used or useful for the distribution or sale of electricity outside its current geographic territory, nor may any non-consumer owned electric system provide, by sale or otherwise, electricity to any parcel of land located outside its current geographic territory.

(Emphasis added.)  While the statute defines the term "current geographic territory" to mean "the parcels of land . . . to which a public electric system was providing electric service on February 16, 1989,"[5] it also defines the term "non-consumer owned electric system"  as "any public electric system other than electric and community service cooperatives and municipal electric systems."  Tenn. Code Ann. § 65-34-102(4) (1993 Repl.) (emphasis added).  The term "municipal electric system" is defined by the statute to include "any electric system owned by any county, municipality, power district, or other subdivision of Tennessee."  Tenn. Code Ann. § 65-34-102(3) (1993 Repl.).  Gibson is an electric cooperative and WCMES is a county-owned electric system.  Neither qualifies as a "non-consumer owned electric system."  Therefore, any limitation contained in Section 103 is not applicable in the context of this case.

## CONCLUSION

We answer the questions certified to us by the United States Court of Appeals for the Sixth Circuit as follows:

1. The Revenue Bond Law, Tenn. Code Ann. §§ 7-34-101 -- 7-34-118, as interpreted by this Court in Duck River Elec. Membership Corp. v. City of Manchester, 529 S.W.2d 202 (Tenn. 1975), authorizes a city to condemn the facilities and service areas of an electric cooperative serving consumers within the city's municipal boundaries and to grant to another county's electric system the right to operate those facilities and provide service to consumers within those service areas.

2. Tennessee Code Annotated Section 6-51-112 does not prohibit the city from altering any service areas that were outside the city's municipal boundaries on March 6, 1968.

[5]Tenn. Code Ann. § 65-34-102 (1) (1993 Repl.).

-12-

The clerk will transmit this opinion in accordance with Rule 23, Section 8 of the Rules of the Supreme Court. The costs in this Court will be taxed to the petitioner, Gibson Electric Membership Corporation.

_____
FRANK F. DROWOTA, III,
JUSTICE

**Concur:**
Anderson, C.J.,
Birch, Holder, Barker, JJ.